THE PEOPLE *ex rel.* Mary A. Sellers, Appellee, *vs.* JAMES J. BRADY, State Auditor, *et al.* Appellants.

*Opinion filed April 23, 1914.*

1. CONSTITUTIONAL LAW—*word "bill" may include the bill and its amendments.* The word "bill" may, according to the context, mean the bill as first introduced in one of the houses of the General Assembly, or it may mean the bill and its amendments in any of its stages until finally passed by both houses, signed by the officers of each house, approved by the Governor and filed by the Secretary of State.

2. SAME—*whether word "bill" includes amendments depends upon connection in which it is used.* Whether the word "bill" is used, in any stage of its progress, to include amendments pending or already adopted must necessarily be shown by the connection in which the word is used.

3. SAME—*every presumption is in favor of validity of a statute.* Every presumption is indulged in favor of the validity of a statute and every reasonable doubt resolved in its favor, and the courts, if possible, must give it a construction to sustain it.

4. SAME—*the rule for construing statute applies to minutes of journals of legislature.* The rule that where a statute or ordinance is capable of two constructions, one of which will sustain and the other defeat it, that construction should be adopted which will sustain it, applies with equal force in construing the minutes of the journals of the legislature with reference to the progress and passage of a bill.

5. SAME—*journals of the legislature cannot be aided or contradicted by other evidence.* The parliamentary history of an act or bill in the legislative journals is the only evidence that is recognized by the courts of Illinois, and the journals cannot be aided or contradicted by other documents or evidence of any kind.

6. SAME—*when the failure to print amendment will not render entire act invalid.* Failure of the journal to show that an amendment was printed will not invalidate the entire act if the amendment and the act are so essentially different and independent that it cannot be said the act would not have been passed without the amendment.

7. SAME—*Civil Service act of 1911 was passed in accordance with the constitution.* The Civil Service act of 1911 (Laws of 1911, p. 222,) must be held, in view of the entire record of the

progress and passage of the bill as shown by the senate journal, to have been passed in accordance with the constitution.

8. SAME—*the Civil Service act of 1911 is not unconstitutional.* The Civil Service act of 1911 does not contravene the provisions of the constitution relating to the three departments of government, nor is it invalid as an attempt to change the constitutional and statutory duties of State officers and to authorize the duties of officers elected for four years to be performed by a civil service board appointed for an indefinite term. (*People* v. *McCullough,* 254 Ill. 9, adhered to.)

9. SAME—*what does not render the Civil Service act invalid.* The Civil Service act of 1911 is not rendered invalid by reason of its provisions that all applicants desiring appointments thereunder shall state their age, health, sex, habits and other qualifications. (*People* v. *Kipley,* 171 Ill. 44, followed.)

10. SAME—*provision for preferring ex-soldiers and sailors of civil war is not invalid.* The provision of the Civil Service act of 1911 that honorably discharged soldiers and sailors of the civil war shall be preferred for appointment to civil service positions, provided they pass the examination and are found to possess the necessary business capacity for the proper discharge of the duties of such positions, is not unconstitutional.

11. SAME—*Civil Service act of 1911 not invalid because of its title.* The Civil Service act of 1911 is not invalid upon the alleged ground that the title embraces more than one subject and that the subject of the act is not embraced in the title.

12. CIVIL SERVICE—*stenographer is not a clerk.* A stenographer is not a clerk, and is not excepted from the classified service by reason of the provision of section 11 of the Civil Service act that all clerks in the office of certain State officers are exempt.

13. MANDAMUS—*what does not prevent court from compelling State Treasurer to act.* The fact that the State Auditor may refuse to obey the judgment of the court commanding him to issue a warrant on the State treasury does not preclude the court from including in its judgment a command to the State Treasurer to countersign and pay such warrant. (*People* v. *Kipley,* 171 Ill. 44, followed.)

FARMER, J., specially concurring.
COOKE, C. J., and CRAIG, J., dissenting.

APPEAL from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding.

P. J. LUCEY, Attorney General, LESTER H. STRAWN, and GEORGE P. RAMSEY, (JOHN J. POULTON, and THOMAS J. YOUNG, of counsel,) for appellants.

JOSEPH M. CONNERY, ARTHUR E. GAMMAGE, and ED-NYFED. H. WILLIAMS, (EDGAR A. BANCROFT, and RUSSELL WHITMAN, of counsel,) for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

Mary A. Sellers filed her petition for a writ of *mandamus* in the circuit court of Cook county in October, 1913, against James J. Brady, as Auditor of Public Accounts of the State of Illinois, William Ryan, Jr., State Treasurer, and the civil service commissioners of the State, praying that *mandamus* issue against said defendants commanding them to restore relator to her position as stenographer in the Chicago office of the Auditor of Public Accounts and to cause a warrant to be drawn on the State Treasurer for the amount due her from July 1, 1913. Answers and replications were filed. After a hearing the trial court ordered that a writ of *mandamus* issue, commanding said Auditor to re-instate the relator, within one day from the entry of said order, to said position of stenographer, and within five days to sign his warrant as such Auditor, payable to relator, for the sum of $506.66, and commanding said State Treasurer to countersign said warrant upon presentation and pay said relator said sum. From this judgment the Auditor and State Treasurer appealed to this court.

It appears from the record that the relator, Mary A. Sellers, had been prior to and was on July 1, 1913, employed as a stenographer in the Chicago office of the Auditor of Public Accounts, that being the date the amendment to the State Civil Service law, governing, as she contends, that position, went into effect. (Laws of 1911, p. 222.) It is contended by appellee that under said law she was placed in the classified civil service of the State without an ex-

amination. It further appears that the Auditor of Public Accounts on June 5, 1913, requested relator to resign, to take effect July 1, 1913; that she refused so to do, and that on said last mentioned date the Auditor appointed one Thyra Cleary to the position formerly occupied by appellee. Without attempting to set out all the facts as to her efforts to retain said position of employment in the Auditor's office, we deem it sufficient to state that if said act of 1911 is constitutional and appellee was by its terms placed in the classified list, the judgment of the trial court should be sustained. It should be added that the State civil service commissioners concede the constitutionality of the act and admit that appellee is within the classified list of said act and they have refused to acknowledge the legality of the appointment of Thyra Cleary.

Appellants urge the unconstitutionality of this statute on several grounds. The first and principal one is, that said amendment of 1911 to the State Civil Service act was not passed in conformity with the provisions of the constitution as to printing certain amendments, as said provisions have been construed by this court in *Neiberger* v. *McCullough,* 253 Ill. 312. Counsel for appellee argue that this question, as well as practically all the other constitutional questions raised by the appellants, is not now an open one in this court, as this act was held constitutional in *People* v. *Mc-Cullough,* 254 Ill. 9; that in that case the constitutionality of this act was attacked; that it was there held that the employees under the Secretary of State were not his employees but the employees of the State, engaged not in his work but in the work of the State,—a public and not a private service; that under the reasoning of this court on a very similar question in *Greenberg* v. *City of Chicago,* 256 Ill. 213, *Richter* v. *Burdock,* 257 id. 410, *Kennedy* v. *Neeves,* 258 id. 24, and *Gifford* v. *Culver,* 261 id. 530, appellants and everyone else are precluded by the decision in *People* v. *McCullough, supra,* from questioning the constitutionality

of said amendment of 1911 to the State Civil Service law. It would be difficult, after holding the act constitutional in *People* v. *McCullough, supra,* to now hold it unconstitutional, and in so doing not overrule the reasoning in *Greenberg* v. *City of Chicago,* and the other cases just referred to on this point. However, as we deem the law constitutional as to the other grounds urged and do not base our decision solely on the ground that this law has heretofore been held constitutional, we shall not further discuss that question.

Counsel for appellants contend that while the said act of 1911, which originated in the house of representatives, legally passed that body before it was acted upon by the senate, certain of the senate amendments were never printed in either house. Certified copies of the original journals of both houses with reference to this bill, (known as House Bill No. 47,) so far as they affect the question under consideration, were introduced in evidence. After the bill had passed the house it was sent to the senate, and the journal of that body shows that on the date of its receipt it "was taken up and read at large a first time, ordered printed, and under the rules" referred to the committee on civil service. Three days later (April 28) the journal shows that the chairman of the senate committee on civil service reported the same back with amendments, and recommended that the "amendments be adopted and that the bill as amended do pass. Under the rules the bill was ordered to a second reading and to be printed with the amendments." May 2, by unanimous consent, it was made a special order for second reading on May 3. On that day the journal shows that it "was taken up and read at large a second time, together with the following amendments thereto, reported from the committee on civil service." Then follow seven amendments. The journal, in setting out each amendment, opens with "Amend printed bill," and then follows a statement of how it shall be amended. The journal then

recites the adoption of the first three amendments, without reference to whether they were printed or not. The fourth amendment was then taken up, and the journal shows that a senator offered an amendment to that amendment, which read: "Amend the fourth committee amendment by inserting after the word 'wardens,' in line 13 of the printed amendment, the words," (then stating certain changes.) Another amendment was thereupon offered as a substitute, which was adopted. The fifth amendment was then taken up and rejected. The sixth amendment was then taken up and after being amended was adopted. Then the seventh amendment was taken up and amended in certain particulars. There is a question raised as to whether this amendment, as amended, was adopted. We shall discuss that later. Thereafter another amendment was offered to the bill, which was lost. Another amendment was then offered, with reference to which the journal reads, "Strike out section 1 of said printed bill, as amended, and insert in lieu thereof the following," (setting forth the proposed substitute.) Pending the vote on this, it was decided to postpone the further consideration of the bill and pending amendments until May 4. On that day the bill was taken up on the pending question as to substituting an amendment for section 11. Before the vote was taken on that question another substitute for the amendment was offered, the journal reading, "Strike out of section 11 of printed House Bill No. 47 as amended in senate and insert in lieu thereof the following," (then giving the substitute.) On vote the substitute was adopted. Farther on the journal reads: "The question then being, 'Shall the bill be ordered to a third reading and the amendments printed?' it was decided in the affirmative." The journal shows then that by unanimous consent, on motion "the consideration of House Bill No. 47 [describing it without reference to the amendments made in the senate] was made a special order for Tuesday, May 9." On May 9 the journal shows that the presiding

officer announced the special order to be "the consideration of House Bill No. 47 [describing it without any reference to the amendments made in the senate] on the order of third reading.

"By unanimous consent Mr. Magill offered the following amendment to the bill, which was adopted:

"Amend section 11 by adding the following: *'Provided,* that in the University of Illinois and the normal schools students may be employed under the rules of the civil service commission without examination or certification, and a private secretary or stenographer in the offices of the dean of men and the dean of women of the University of Illinois shall not be included in the classified service.'

"And the bill, having been printed, was taken up and read at large a third time.

"And the question being, 'Shall this bill pass, together with senate amendments thereto?' it was decided in the affirmative by the following vote," (then follow the names of those voting.)

The copy of the house journal with reference to said senate amendments is shown. It does not indicate whether said amendments were printed in the house or not, but shows that the six amendments adopted by the senate were concurred in by the house.

Do these minutes that we have quoted from the journal of the senate show that the bill, with the senate amendments, was printed before being acted upon by that body? When said bill was ordered to a second reading in the senate the journal shows that the bill, with amendments, was ordered printed. Three days later the journal shows that the bill was taken up and read at large a second time, together with the amendments, and that the amendments each stated, "amend printed bill." Is not the conclusion inevitable that this refers to the house bill in the senate and that it was printed? In amending the fourth committee amendment the journal recites, amend "the printed amend-

ment." The conclusion is just as strong from this that this amendment had been printed. These conclusions are strengthened by one of the senate rules to which our attention is called in the briefs: That the secretary of that body shall provide that a certain number of copies of the proceedings shall be printed and placed on the desk of each senator by nine o'clock each morning. After the seven admendments had been acted on,—six adopted and one rejected,—the journal shows that the bill was ordered to a third reading and the amendments printed. If the bill, without the amendments, had not been printed at that time, why did not the motion require that such bill should be printed? Clearly, the amendments ordered printed were the ones that had just been adopted on that day and had not been ordered printed before. Five days later the bill was taken up on third reading and Senator Magill's amendment adopted by unanimous consent. Then the journal says, "The bill having been printed, was taken up and read at large a third time." Reading this last sentence by itself, without reference to the rest of the minutes of the journal, everyone would clearly understand it to mean that the bill, with all its amendments, having been printed, was taken up and read at large the third time.

Section 13 of article 4 of our constitution, which requires the printing of bills and their amendments, also requires every bill shall be read at large on three different days in each house. This court has held that amendments to bills, under our constitution, need not be read on three several days, (*People* v. *Wallace,* 70 Ill. 680,) and this is the rule in certain other jurisdictions. (1 Lewis' Sutherland on Stat. Const.—2d ed.—sec. 54, and cases cited.) But other courts, under very similar provisions of the constitution, require amendments to be read at large on three different days. (*Cohn* v. *Kingsley,* 38 L. R. A. [Idaho] 74, and cases cited.) This last holding is in accordance with general parliamentary usage. "Amendments proposed

at the second reading shall be twice read, and those proposed at the third reading thrice read, as also all amendments from the other house." (Jefferson's Manual,—Barclay's Dig.—117.) It is obvious, also, from the minutes in the journal as to the reading at large of the bill in the senate, that the amendments were intended to be read, and were read, as a part of the bill. The same thing is shown by the minutes of the house journal on the passage of the bill originally through that house. This being so, it necessarily follows that in the sentence from the senate journal quoted above, the word "bill" must be understood, so far as the reading at large a third time is concerned, to include the senate amendments as well as the original bill. If it does so as to reading at large the third time, surely it also includes within its meaning the printing of amendments under the wording, "the bill having been printed."

Counsel for the appellants say that this cannot be the conclusion, because in the very next paragraph the journal states, "And the question being, 'Shall this bill pass, together with the senate amendments thereto?'" that the word "bill," as there used, did not include the amendments, and naturally the word would not be understood to include the amendments in the former sentence. With this we can not agree. In construing the journal minutes with reference to this bill, as in construing a statute or a contract, the chief question must be, what is the meaning of the words used? In all such matters the context, in construing the meaning of words in any writing, "may show that the same word used repeatedly in the same act (writing) is not used in the same sense." (2 Lewis' Sutherland on Stat. Const.—2d ed.—sec. 399, and cases cited.) Reference to the minutes, both of the house and senate, as found in this record as to the passage of this bill, will show that the word "bill" is frequently used as including amendments. The minutes as to the last action on this bill in the house before it was sent to the senate, state that "House Bill

No. 47 * * * having been engrossed and all amendments adopted thereto having been printed, was taken up and read at large a third time. And the question being, 'Shall this bill pass?' it was decided in the affirmative," etc. In the first sentence just quoted the word "bill" necessarily includes the amendments as having been engrossed along with the original bill, although in the very next clause it refers to the amendments separately, and in the next clause "bill" necessarily refers to both the original bill and its amendments as having been read at large a third time. In the last sentence, the clause, "Shall this bill pass?" refers not only to the original bill but to the amendments as a part of that bill.

Under ordinary parliamentary practice, in putting a bill upon its final passage in either house the question is stated, "Shall this bill pass?" (Jefferson's Manual,—Barclay's Dig.—117, 121; Barclay's Digest,—Jefferson's Manual,—23.) By some authorities it is held to be proper to put the final passage of a question or bill, "Shall the motion as amended (or bill as amended) pass?" (Roberts' Rules of Order, sec. 65.) The question, put in either way, "Shall the bill pass?" or "Shall the bill as amended pass?" means the same thing. It is always intended to put upon its final passage a motion, resolution or bill in its final form as amended. We think, therefore, there is no reasonable basis for an argument that on the final passage of this bill as amended in the senate the word "bill" cannot be held to include senate amendments in the first sentence referring to its having been printed and read at large a third time, because on its final passage the question was stated, "Shall this bill pass, together with senate amendments?" A different meaning for the word "bill" is found in several places in the senate journal, as shown in the quotations heretofore given, and also in the house journal. Section 13 of article 4 of the State constitution, requiring the printing of bills, reads: "Every bill shall be read at large

on three different days, in each house; and the bill and all amendments thereto shall be printed before the vote is taken on its final passage; and every bill, having passed both houses, shall be signed by the speakers thereof." The word "bill" in the first clause of said constitutional provision means the original bill on first reading without amendments, or the bill on subsequent readings with amendments. In the next clause "bill" means the bill without amendments. In the last clause "bill" means the bill with all amendments as finally passed. This must necessarily be so, and the context must be relied on to show, in each instance, the meaning of the word "bill." When discussing the constitutional provision as to printing bills, the members of the constitutional convention used the word "bill" repeatedly with the meaning of "original bill," "original bill as amended," "bill" in any stage of the proceedings during its passage, and also often as meaning the original bill in contradistinction from the amendments. The meaning, in each case, can be readily ascertained from the connection in which the word was used. (1 Debates on the Const. of 1870, pp. 533, 537.) After a bill has been amended the amendment is incorporated as a part of the text of the bill and is properly understood to be included in the word "bill." (Jefferson's Manual,—Barclay's Dig.—127.) After amendments have been adopted they are as much a part of the bill as if they had been included in its original wording. The word "bill" may mean the bill as it is first introduced in one of the houses of the legislature, or it may refer to it at any time in any of its stages until finally passed by both houses, signed by the officers of each house, approved by the Governor and filed by the Secretary of State. (*County of Sedgwick* v. *Bailey,* 13 Kan. 446; 1 Words and Phrases, 776, and cases cited.) Whether the word "bill" is used in any of these stages to include amendments pending or already adopted must necessarily be shown by the connection in which the word is used. The senate journal,

in stating that the bill was ordered to a third reading, used the word "bill" as meaning the bill and its amendments. After the adoption of the amendment by unanimous consent on the order of third reading, the journal shows that "the bill * * * was taken up and read at large a third time." "Bill" then must mean the amendments as well as the original bill, and in the very same sentence, as a parenthetical phrase, it is stated the bill "having been printed." It seems difficult to make any reasonable argument that the word "bill," here, with reference to the printing, has a different meaning than it does as to the bill being read at large.

Every presumption is indulged in favor of the validity of a statute and every reasonable doubt resolved in its favor. (*People* v. *Nelson*, 133 Ill. 565; *People* v. *Hazelwood*, 116 id. 319.) The court, if possible, must give a statute such a construction as will enable it to have effect. Whenever an act of the legislature can be so construed as to avoid conflict with the constitution and give it the force of law, such construction will be adopted by the courts. (Cooley's Const. Lim.—7th ed.—255; *Newland* v. *Marsh*, 19 Ill. 376.) If an ordinance or statute is susceptible of two constructions, that construction should be adopted which will sustain its validity or constitutionality. (*Berry* v. *City of Chicago*, 192 Ill. 154; *Village of Donovan* v. *Donovan*, 236 id. 636; *City of Chicago* v. *Lowenthal*, 242 id. 404.) This same reasoning must apply with equal force to the construction of the minutes of this journal. Conceding that the word "bill" in the sentence of the senate journal, "the bill having been printed," etc., is susceptible of two constructions or two meanings, then the one that will sustain the law must, under these authorities, be adopted.

It is insisted, however, by appellants, that it is impossible for the Magill amendment, adopted unanimously, to have been printed, as the bill, with its amendments, was passed the same day, the argument being, that from the journal minutes it must be inferred that it was passed im-

mediately after said amendment was adopted. There is nothing in the minutes shown in this record that would make such a conclusion necessary, or to show that time was not taken after the adoption of said amendment to print it and distribute the printed amendment before the final passage of the bill in the senate. The parliamentary history of an act or bill in the legislative journals is the only evidence that is recognized by the courts in this State, and the journals cannot be aided or contradicted by other documents or evidence of any kind. (1 Lewis' Sutherland on Stat. Const.—2d ed.—sec. 47; *Spangler* v. *Jacoby,* 14 Ill. 297; *People* v. *McCullough,* 210 id. 488; *People* v. *Rose,* 254 id. 332.) Giving this sentence in the senate journal, in connection with its context, the natural meaning as to the printing of the bill, it must be held that not only the original bill but the amendments were printed, as well as read at large the third time. Even if it were conceded that the journal record is such that it is necessary to hold that the amendment presented and adopted by unanimous consent on the third reading in the senate was not printed, that would not render the act in question void but only invalidate said amendment. The amendment and the rest of the act are so essentially different, distinct and independent, each of the other, that by holding the amendment invalid it would not be necessary to decide that all the rest of the act is invalid. (*Noel* v. *People,* 187 Ill. 587; *People* v. *Olsen,* 222 id. 117; *Sheldon* v. *Hoyne,* 261 id. 222; Cooley's Const. Lim.—7th ed.—247; 1 Lewis' Sutherland on Stat. Const.—2d ed.—sec. 306.) The position sought by petitioner is not affected in any way by said amendment.

Before leaving the subject of the adoption of the senate amendments it is necessary to refer again to the adoption of the seventh senate amendment by that body. The sixth and seventh senate amendments recommended by the committee on civil service for adoption were to amend, respectively, the title and section 1 of the house bill so as to

make them in harmony with the entire bill as amended by the adoption of the previous five proposed senate amendments. After senate amendment 5 (which proposed adding a section to the act) was rejected by the senate, senate amendment 6 was amended, before its adoption, so as to show that one less section was added. In attempting to amend senate amendment 7 of section 1 to show such change the amendment to the amendment was adopted, but the senate journal minutes do not show specifically that after it was amended said seventh amendment was adopted. We think it is clear, however, from the entire record, especially taking into account the journal minutes on the third reading of the bill at the time it was adopted, that the senate intended to adopt the seventh amendment as amended. There is no constitutional provision with reference to the way amendments, or amendments to amendments, shall be adopted in either house of the legislature. This court has held that on questions of this kind the rule for the guidance of the courts is to ascertain the intention of the legislature, and not its mistakes either as to law or fact, the only question being, has the legislature expressed its purpose intelligibly? If it has, then the act is valid and should be upheld. (*Patton* v. *People,* 229 Ill. 512, and cases cited; *People* v. *VanBever,* 248 id. 136; *People* v. *Morrell,* 234 id. 47.) This rule is in accord with the great weight of authority in other jurisdictions. (1 Lewis' Sutherland on Stat. Const.—2d ed.—sec. 233, and cases cited; *Jones* v. *Commissioner,* 21 Mich. 236.) Furthermore, even if said senate amendment 7 was not adopted by that body it would not invalidate the bill, for the title was properly amended even if said section 1 was not amended. To show the intent of the legislature the title may be considered in connection with the rest of the bill. In *Patton* v. *People, supra,* this court held that if the title of the act purports to re-enact a former statute, the intent of the legislature to re-enact said statute is established even though the body of the act does

not re-enact it. That was going farther than is necessary to go in this case to uphold the validity of this amendment even though it be conceded it was not passed by the senate.

Appellants argue at length as to the invalidity of this act because it contravenes the various provisions of the constitution which separate the legislative from the judicial power, claiming that the civil service commission, under this act, exercises judicial functions. It is also contended that the act is an attempt to change by the legislature the constitutional and statutory duties of appellants and to permit the duties of officers elected for a term of four years to be performed by the civil service board appointed for an indefinite term. Whatever merit there may be in these contentions was considered and discussed at length by this court in passing on the constitutionality of this act in *People* v. *McCullough,* 254 Ill. 9. Not only the opinion of the court but the concurring and dissenting opinions show conclusively that all of these points were considered and decided in that case. To sustain the contention of appellants on these points would require the overruling of the former case. It would serve no useful purpose, therefore, to enter into a discussion of those questions. We deem it sufficient to say that we adhere to the conclusions reached in that case on these questions, and hold that the law is not unconstitutional on those grounds here again urged.

Appellants further urge that the law is unconstitutional because of its provisions that all applicants desiring appointments thereunder shall state their age, health, sex, habits and other qualifications. A similar argument urged against the City Civil Service law was considered and decided adversely to the contention of appellants in this case in *People* v. *Kipley,* 171 Ill. 44, and this has always been the holding of the court in every jurisdiction where the constitutionality of a civil service statute has been upheld. The foundation principle of any civil service act is that appointments shall be made according to merit and fitness, to be

ascertained by reasonable competitive examinations, with specific limitations as to residence, age, health, habits and moral character. *People* v. *Kipley, supra; Ptacek* v. *People,* 194 Ill. 125.

The further argument is made that the law is unconstitutional, as special legislation, because of the exemptions in the act as to certain officers and employees. This court has frequently said that if all laws were held unconstitutional because they did not embrace all persons few would stand the test; that a law is general, not because it embraces all the governed, but that it may from its terms, when many are embraced in its provisions, embrace all others when they occupy like positions to those who are 'embraced. A law that is made applicable to a certain class or classes of citizens must be based upon some substantial difference between the situation of that class or classes and other individuals or classes to which it does not apply. (*Hawthorn* v. *People,* 109 Ill. 302; *Ritchie & Co.* v. *Wayman,* 244 id. 509; *People* v. *Elerding,* 254 id. 579; *City of Clinton* v. *Wilson,* 257 id. 580.) There is a substantial difference existing under this law as to the classification of officers and employees complained of. Very similar classifications as to exemption are made in the City Civil Service law, and while all the objections here raised do not seem to have been passed upon by this court, no one has heretofore questioned the reasonableness of such classification. There is, however, one of these exemptions that is specifically referred to in the briefs, and authorities are cited from other jurisdictions to show that this exemption is unconstitutional. That is with reference to the provision under section 10 that persons who were engaged in military or naval service in the civil war and have been honorably discharged, having passed the examination, shall be preferred for appointment to civil service positions, provided they are found to possess business capacity necessary for the proper discharge of the duties. It is stated that similar provisions

562 — 38

have been held unconstitutional by the highest courts of New York and Massachusetts. In this, we think, counsel are in error. In *In re Matter of Keymer,* 148 N. Y. 219, the court was construing a provision of the constitution of that State which specifically referred to appointments and promotions to be made in the civil service of the State. We have no similar provision in our constitution, and therefore that authority has no bearing on the present question. The case of *Brown* v. *Russell,* 166 Mass. 14, while construing a constitutional provision different from our own, in its reasoning tends to uphold this provision of our statute rather than to invalidate it, for the opinion states (p. 23) : "The original statute of 1884, (chap. 320,) concerning the civil service, required that the rules should provide 'for giving preference in appointments to office (other qualifications being equal) to applicants who served in the army or navy of the United States in time of war and have been honorably discharged therefrom.' * * * It may be said that, other qualifications being equal, there are reasons to believe that a veteran soldier or sailor often will make a better civil officer than a person who never has been subjected to the discipline of service in war, and it is distinctly a public purpose to promote patriotism, and to make conspicuous and honorable any exhibition of courage, constancy and devotion to the welfare of the State shown in the public service. These things, we assume, the legislature may take into account in providing for appointments to office where the qualifications are not prescribed by the constitution." We are in full accord with this reasoning. (To the same effect see *Shaw* v. *Marshalltown,* 131 Iowa, 128; 1 Dillon on Mun. Corp.—5th ed.—sec. 408, and cases cited.) As there are no qualifications prescribed by our constitution on this question conflicting with the provisions of the State Civil Service law with reference to the honorably discharged soldiers and sailors, the law in this regard must be held constitutional.

The further contention is made, that even if the law is held constitutional the relator is not within its provisions because a stenographer must be held to be a clerk under section 11, and because, it is contended, by that section all clerks in the offices of certain State officials, including the Auditor and Treasurer, are exempt. We do not think section 11 of the act can be so construed. That section mentions, specifically, stenographers in a separate sentence from clerks and only exempts one stenographer in each office. Manifestly, the legislature did not intend to exempt all stenographers. In 2 Bouvier's Law Dict. (Rawle's ed.) 1037, a stenographer is defined as "one who writes in shorthand by using abbreviations or characters for words. He does not come within the common law definition of the word 'clerk.' "

The further suggestion is made that the act is unconstitutional for the reason that the title embraces more than one subject and that subject is not embraced in the title. Under the reasoning of this court in *People* v. *McBride*, 234 Ill. 146, *People* v. *Joyce*, 246 id. 124, *Beauchamp* v. *Sturges & Burn Manf. Co.* 250 id. 303, *People* v. *City of Chicago*, 256 id. 558, and other decisions cited in those cases, the act in this regard must be held in compliance with the constitution.

The further point is made that the court cannot *mandamus* the State Treasurer to do something on the contingency and assumption that the State Auditor will first perform another duty. This question is passed on adversely to appellants' contention in *People* v. *Kipley, supra*.

The judgment of the circuit court will be affirmed.

*Judgment affirmed.*

Mr. JUSTICE FARMER: I am not in accord with the decision in this case but concur in it because of the decision in *People* v. *McCullough*, 254 Ill. 9, holding the Civil Service act to be constitutional. I did not agree with that

decision but agreed with the views expressed by Mr. Justice Vickers in a dissenting opinion, in which I concurred. A majority of the court have accepted and acted upon the decision in the *McCullough case* as settling the constitutionality of the act, and I now deem it my duty to acquiesce.

CRAIG, J., and COOKE, C. J., dissenting.